# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TERESITA J. DUMAIS,

      Plaintiff,

vs.                                                            No. CIV 00-0255 MV/LCS

AMERICAN GOLF CORPORATION
d/b/a PARADISE HILLS GOLF CLUB,
and WILLIAM WINKLER,

      Defendants.

### MAGISTRATE JUDGE'S PROPOSED FINDING
### AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Defendants' Motion to Compel Arbitration and Request for Immediate Stay (Doc. 8), filed May 18, 2000, and the parties' Supplemental Briefs Regarding the Ramifications of *Green Tree Financial Corp. v. Randolph,* 121 S.Ct. 513 (2000) on the Motion to Compel Arbitration (Docs. 52, 54, 55, 56). On March 28, 2001, United States District Judge Martha Vazquez referred this Motion pursuant to 28 U.S.C. § 636 (b)(1)(B). The Court held an evidentiary hearing and heard oral argument on this matter on April 25, 2001. The Preliminary Findings of March 29, 2001 are hereby withdrawn in their entirety. The United States Magistrate Judge, having considered the Motion, memoranda, briefs submitted by the parties, and the applicable law, and recommends that this Motion be **DENIED**.

### PROPOSED FINDINGS

1.      Plaintiff was employed at the Paradise Hills Golf Club as a service employee. (Pl. Aff. at ¶ 2.) Plaintiff alleges that the General Manager of this facility, Defendant William Winkler (Winkler) subjected her to a barrage of sexual harassment until her constructive discharge. In her

Complaint, Plaintiffs asserts claims for sexual harassment and constructive discharge under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and a supplemental state law claim for retaliatory discharge against AGC.   Plaintiff also asserts supplemental state law claims for intentional infliction of emotional distress and prima facie tort against both AGC and Winkler.

2.      Plaintiff asserts that AGC hired her on May 3, 1996.  Defendants, however, claim that AGC hired Plaintiff on July 25, 1996, when it bought out Golf Enterprises.  Plaintiff testified at the evidentiary hearing that she submitted her application for employment on May 2, 1996, and that she went to work as a waitress at the Paradise Hills Golf Club on May 3, 1996.  In July 1996, Plaintiff was promoted to banquet captain. Around July 1996, Plaintiff was called into to the office and told to fill out an application for employment and to sign a New Co-Worker Authorization & Acknowledgment Form and a Policy Against Harassment in the Workplace / "We Can Work It Out" Form.   Plaintiff testified that she filled out and signed these forms as quickly as possible because she needed to get back to work.  Plaintiff was not told that she would be fired if she failed to sign the forms.  There is no evidence that Plaintiff filled out an I-9 or a W-4 form on July 25, 1996.

3.      The cover sheet for Plaintiff's July 25, 1996 application for employment is captioned "Joining the American Golf / Golf Enterprises Team" and repeatedly thanks Plaintiff for her interest in "American Golf / Golf Enterprises."   (Def. Ex. B.)  As of December 1996, Plaintiff's pay statements listed Golf Enterprises as her employer.  (Pl.'s Ex. 3-4.)  Beginning in January 1997, Plaintiff's pay statements listed AGC as her employer and her hire date as "May 3, 1996."  (Pl.'s Ex. 5-6.)  Both the Golf Enterprises and the AGC pay statements used "67805" as Plaintiff's employee identification number, and both Golf Enterprises and AGC used the same Santa Monica, California address.  Plaintiff received a Golf Enterprises, Inc. 401(k) plan summary for the calendar year of

2

1996.

4.      Defendants did not proffer live testimony at the evidentiary hearing on April 25, 2001, instead submitting the Declarations of Charles Vandenberg and Carol Vandenberg, which they argue are admissible under FED. R. EVID. 807.  The Vandenbergs are no longer employed by AGC and reside in Mesa, Arizona.   Defense counsel represented that the declarations had been faxed to Plaintiff's counsel the day before the hearing.  Rule 807 requires, *inter alia*, that the offered statement be more probative than any other evidence which the proponent can procure through reasonable efforts and that the adverse party has received sufficient notice for a fair opportunity to meet the hearsay statements.   FED. R. EVID. 807.   Defendants could have obtained the testimony of the Vandenbergs by subpoena or deposition through reasonable efforts.  Moreover, Defendants failed to give sufficient notice to Plaintiff to meet to declarations.   Thus, the Declarations do not satisfy the requirements of FED. R. EVID. 807 and are not otherwise admissible. The Declarations of Charles Vandenberg and Carol Vandenberg are inadmissible and are not considered herein.  The Declarations however, will be made part of the record for appellate purposes.

5.      Plaintiff's testimony was fully credible.  There is no evidence that Plaintiff filled out an I-9 or a W-4 form on July 25, 1996.  Based on Plaintiff's testimony and the documentary evidence, I find that Plaintiff was hired on May 3, 1996.  Plaintiff did not re-apply for employment on July 25, 1996, and was not re-hired by American Golf / Golf Enterprises after her hire date of May 3, 1996. Plaintiff executed the agreement to arbitrate on July 25, 1996, over two-and-a-half months after she was hired.

6.      AGC's contention that it hired Plaintiff on July 25, 1996 when it acquired Golf Enterprises is without merit.  Company documents repeatedly refer to AGC as " American Golf / Golf

Enterprises." (Def. Ex. B, entitled "Joining the American Golf / Golf Enterprises Team.")  As of December 1996, Plaintiff's pay statements listed Golf Enterprises as her employer. (Pl.'s Ex. 3-4.) Both the Golf Enterprises and the AGC pay statements used "67805" as Plaintiff's employee identification number, and both Golf Enterprises and AGC used the same Santa Monica, California address.  Plaintiff received a Golf Enterprises, Inc. 401(k) plan summary for the calendar year of 1996.  Golf Enterprises and AGC were either the same entity for purposes of Plaintiff's employment, or they were her joint employers. *See Zinn v. McKune*, 143 F. 3d 1353, 1361 (10th Cir.1998) (independent entity with sufficient control over the terms and conditions of the employment of a worker formally employed by another is a joint employer within the scope of Title VII).  For the purposes of Plaintiff's employment, ACG and Golf Enterprises were the same entity.  Plaintiff was hired only once; on May 3, 1996, and was not rehired on July 25, 1996.

7.     Defendants moved to compel arbitration based on two documents signed by Plaintiff on July 25, 1996.  The first document states that "I acknowledge that I have read, understand, and will use, the "We Can Work It Out" program when I am eligible; that I understand and agree to the Arbitration provision on the reverse side of this form . . ." (Defs. Ex. A.)  The second document, entitled "New Co-Worker Authorization & Acknowledgment Form," acknowledges that Plaintiff received, understood and would comply with the Co-Worker Alliance Handbook and AGC's "We Can Work It Out Program."  (Defs. Ex. B at 1.)

8.     Immediately following the "We Can Work It Out Program" portion of the Co-Worker Alliance Handbook is a paragraph captioned  "Arbitration," providing in pertinent part:

> I agree that any claim of unlawful harassment or discrimination or claims of wrongful discharge, arising out of my employment with AGC, including public policy claims, contract claims and claims

4

involving any applicable Federal, State, or Local statute, ordinance or regulation relating to the termination of my employment, employment discrimination, harassment or retaliation, will be resolved exclusively by final and binding arbitration and not by court action.  I may begin the arbitration process by delivering a written request for arbitration to AGC's Human Resources Department . . . . I acknowledge that am knowingly and voluntarily waiving my right to pursue such claims in court and instead will pursue them through arbitration.  If I proceed with arbitration, I agree that any such arbitration will be conducted using the 1989 Model Employment Arbitration procedures of the American Arbitration Association ("AAA"). . . . This arbitration shall be the exclusive means of resolving any dispute(s) listed in this agreement and no other action will be brought in any court or administrative forum.  If any court of competent jurisdiction declares that any part of this Arbitration Agreement is illegal, invalid or unenforceable, such a declaration will not affect the legality, validity or enforceability of the remaining parts of the Agreement, and the illegal, invalid or unenforceable part will no longer be part of this Agreement.

(Defs. Ex. B at 4.)

9.     The Co-Worker Alliance Handbook further states that "I understand that this handbook superseded any and all prior handbooks and that except for employment at-will and the agreement to arbitrate as provided for in this handbook, AGC reserves the right to at any time change, delete, modify, or add to any of the provisions contained in this handbook at its sole discretion, by giving written notice to us." (Pl. Ex. 1 at p. 6.)  At the back of the Co-Worker Alliance Handbook is an "Acknowledgment" stating that "I further understand that the Company reserves the right to amend, supplement, rescind or revise any policy, practice, or benefit described in this handbook – other than employment at-will provisions – as it deems appropriate."  (Pl. Ex. 1 at 8.) Plaintiff asserts that she never received a copy of the Co-Worker Alliance Handbook and AGC's "We Can Work It Out Program." (Pl. Aff. at ¶5.)

10.     Plaintiff opposes arbitration, arguing that the alleged agreement is unenforceable due

to a fee shifting provision, the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, does not apply to

an employment contract, Defendants waived or abandoned any alleged right to arbitrate, the alleged

agreement does not apply to all claims in this case, the alleged agreement is unconscionable, the

alleged agreement is illusory, the alleged agreement is not mutual, and the alleged agreement is

unsupported by consideration.  Plaintiff requested a hearing to resolve disputed factual issues.

11.     On September 7, 2000, I issued an Memorandum Opinion and Order denying the

Motion to Compel Arbitration based on Tenth Circuit precedent holding that an arbitration agreement

containing a cost-sharing provision was unenforceable.  *Shankle v. B-G Maintenance Management*

*of Colorado, Inc.*, 163 F. 3d 1230, 1234 (10th Cir. 1999).  However, I noted that:

> The United States Supreme Court has granted certiorari on the issue
> of whether an arbitration agreement that was silent on the issue of
> costs is unenforceable because Plaintiff's ability to vindicate statutory
> rights might be undermined.  *See Green Tree Financial Corp. v.*
> *Randolph*, 120 S. Ct. 1552, 68 U.S.L.W. 3629 (U.S. Apr. 3, 2000)
> (No. 99-1235).  Oral argument is scheduled for October 3, 2000.
> Defendant may raise the validity of the arbitration agreement in light
> of any change in the law.

(Mem. Op. and Order at 5-6.)

12.     On December 11, 2000, the United States Supreme Court issued its opinion, reversing

the Eleventh Circuit and holding that a party seeking to invalidate an arbitration agreement due to

prohibitive arbitration fees bears the burden of proof and that the possibility of such party incurring

prohibitive costs is too speculative to invalidate an arbitration agreement where the record reveals

only that the agreement is silent on the subject of arbitration costs. *Green Tree Financial Corp. v.*

*Randolph*, 121 S.Ct. 513 (2000).  I directed the parties to submit supplemental briefs on the

ramifications of *Randolph* on the Motion to Compel Arbitration and subsequently withdrew my

Memorandum Opinion and Order of September 7, 2000.

13.     Unlike the agreement in *Randolph*, the purported agreement in this case is not silent on the issues of costs, instead adopting the 1989 AAA procedures.  The 1989 AAA procedures require that the filing party pay a non-refundable administrative fee of $300.00 and $75.00 for each second or subsequent hearing and that all expenses of arbitration be borne equally by the parties, unless they agree otherwise or the arbitrator directs otherwise in the award.  (Pl. Ex. 2 at 10.)  Under *Randolph,* the party seeking to avoid arbitration must prove that "arbitration would be prohibitively expensive."  *Randolph*, 121 S.Ct. at 522.  Plaintiff has presented little evidence to indicate that arbitration would be prohibitively expensive.  AGC has represented to this court its willingness to pay all arbitration fees arising from this dispute.  Under these circumstances, the fee shifting provision does not invalidate the alleged arbitration agreement.  I will therefore turn to Plaintiff's additional arguments in opposition to arbitration.

14.     Congress' purpose in enacting the FAA was "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).  The FAA constitutes a congressional declaration of a liberal federal policy favoring arbitration agreements.  *See Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983).  Thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Id.*, 460 U.S. at 24-25.  Employment discrimination claims arising under federal statutes are subject to mandatory arbitration upon a valid agreement to arbitrate.  *See Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F. 3d 1482, 1487 (10th Cir. 1994).  The party resisting arbitration bears the burden of

7

proving that the claims at issue are unsuitable for arbitration.  *Gilmer*, 500 U.S. at 26.

15.     Before a federal judge may stay proceedings pending arbitration, however, he must be satisfied that the issues involved in the suit are referable to arbitration under the agreement between the parties.  *See* 9 U.S.C. § 3.  "[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).  As in any contract case, the parties' intent is controlling with regard to whether they agreed to arbitrate a particular dispute, and determining intent is a question of law for the court.  *See Armijo v. Prudential Ins. Co.*, 72 F. 3d 793, 797 (10th Cir. 1995) (citing *Mitsubishi*, 473 U.S. at 626).  State law principles of contract formation govern the determination of whether an agreement to arbitrate has been reached.  *See Avedon Engineering, Inc. v. Seatex*, 126 F. 3d 1279, 1287 (10th Cir. 1997).

16.     Plaintiff argues that the FAA does not apply to contracts of employment, relying on Ninth Circuit authority recently overruled by the Supreme Court.  The FAA excludes from coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  The Ninth Circuit had held, based on this exclusion, that all contracts of employment were beyond the FAA's reach, regardless of whether the worker was engaged in transportation.  *Circuit City Stores, Inc. v. Adams*, 194 F. 3d 1070 (9th Cir.1999) (*reversed, see infra*).  The Ninth Circuit's holding was at odds with the holding of other circuits, including the Tenth Circuit.  The Tenth Circuit had held that the exception for "workers engaged in foreign or interstate commerce" does not encompass all employment contracts but instead only those of workers "engaged in the channels of interstate commerce."  *See McWilliams v. Logicon*, 143 F. 3d 573, 575-76 (10th Cir.1998).

17.     On March 21, 2001, the Supreme Court determined that "the better interpretation is to construe the statute, as most Courts of Appeals have done, to confine the exemption to transportation workers." *Circuit City Stores, Inc. v. Adams,* 121 S.Ct.1302, 1311 (2001).  Because Plaintiff's employment did not involve transportation the exemption does not exclude her from coverage. *Id.*  Therefore, the FAA applies.

18.     Plaintiff contends that AGC waived any right to arbitrate.  A party asserting waiver under an arbitration agreement bears a heavy burden of proof.  *Peterson v. Shearson/American Express, Inc.*, 849 F. 2d 464, 466 (10th Cir. 1998).  A court should consider the following factors in determining whether a party has waived its right to arbitration: (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether judicial discovery procedures not available in arbitration had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party. *Metz v. Merrill Lynch, Pierce, Fenner and Smith*, 39 F. 3d 1482, 1489 (10th Cir. 1994).

19.     Consideration of these factors militates against arbitration.  Defendants have submitted the affidavit of their attorney, Karen O. Strauss, stating that she did not notice the purported arbitration agreement until May 6 or 7, 2000.  (Strauss Aff. ¶ 4.)  When Defendants filed the Motion to Compel Arbitration, the case had only been pending for three months, formal discovery had not begun, no hearings had been held, and a trial date had not been set.  Furthermore, Plaintiff has failed

to show how she was prejudiced by the delay.  Under these circumstances, Defendants did not waive any right to arbitrate.

20.     Plaintiff next raises several contract theories, asserting that the alleged agreement is unenforceable because she is a native of the Phillippines, was not given explanation of the arbitration policy and procedures, and was not given any time to review the agreement before she was required to sign it. Generally, a party who executes a written contract with another is presumed to know the terms of the agreement, and to have agreed to each of its provisions in the absence of fraud, misrepresentation or other wrongful act of the contracting party.  *Smith v. Price's Creameries*, 98 N.M. 541, 545, 650 P.2d 825, 829 (1982).  Plaintiff's arguments in this regard are unavailing under the circumstances of this case.

21.     Plaintiff's level of sophistication and ability to understand English would be relevant only if she alleged Defendants wrongfully induced her to signing the agreement.  *See Burchett v. Allied Concord Financial Corp.*, 74 N.M. 575, 578-579, 396 P.2d 186 (1964) (intelligence, business experience, and ability to understand English are among factors to consider where party allegedly tricked into signing agreement).  However, Plaintiff does not assert that Defendants engaged in any misrepresentation regarding the alleged arbitration agreement or that she was unable to read it.  Her assertion that she was entitled to additional time to review the agreement is unsupported.  Thus, Plaintiff's arguments are without merit.

22.     The purported agreement may contain terms that favor AGC over Plaintiff.  Under New Mexico law, imbalanced terms do not invalidate an arbitration agreement, unless they rise to the level of unconscionability. *Monette*, 126 N.M. at 751, 975 P.2d at 364.  The threshold for unconscionability is very high, as the "terms must be such as, 'no man in his senses and not under

10

delusion would make on the one hand, and ... no honest and fair man would accept on the other.' "

*Guthmann v. La Vida Llena*, 103 N.M. 506, 511, 709 P.2d 675, 680 (1985) (*quoting In re Friedman*,

64 A.D.2d 70, 407 N.Y.S.2d 999, 1008 (1978)).  The terms of the contract in the instant case do not

rise to the level of unconscionability.  While the terms may be more favorable to AGC, they do not

invalidate the agreement.

23.     Plaintiff contends that the alleged arbitration agreement does not cover her claims for

intentional infliction of emotional distress and prima facie tort and she did not agree to arbitrate with

Defendant Winkler.  Although arbitration agreements are broadly construed with doubts being

resolved in favor of coverage, they cannot be rewritten to include additional claims and parties

outside their scope.  *See Zink v. Merrill Lynch*, 13 F. 3d 330, 332 (10th Cir. 1993).  The terms of the

alleged arbitration agreement provide that:

> I agree that any claim of *unlawful harassment* or *discrimination* or
> *claims of wrongful discharge*, arising out of my employment with
> AGC, *including* public policy claims, contract claims and claims
> involving any applicable Federal, State, or Local statute, ordinance or
> regulation relating to the termination of my employment, employment
> discrimination, harassment or retaliation, will be resolved exclusively
> by final and binding arbitration and not by court action.

(Defs. Ex. B at 4) (emphasis added).

24.     The Complaint alleges claims for sexual harassment and constructive discharge under

Title VII, a supplemental state law claim for retaliatory discharge against AGC, and supplemental

state law claims for intentional infliction of emotional distress and prima facie tort against both AGC

and Winkler.  Under the plain meaning of the alleged arbitration agreement, the Title VII and the

retaliatory discharge claims are covered, but the intentional infliction of emotional distress and the

prima facie tort claims are not.  Moreover, the claims against Defendant Winkler are not subject to

arbitration because he is not a party to the agreement.  Thus, the alleged agreement does not cover all the claims alleged in the Complaint.

25.     Additionally, Plaintiff contends that the agreement is invalid because she never received a copy of the Co-Worker Alliance Handbook, and was not given a copy of the rules and procedures governing arbitration.  Courts have voided arbitration agreements where the plaintiff was not given a copy of the agreement or the governing rules and procedures. *Gibson*, 121 F.3d at 1131; *Hooters*, 39 F. Supp.2d at 614.   Plaintiff signed a "New Co-Worker Authorization & Acknowledgment Form" acknowledging that she received, understood and would comply with the Co-Worker Alliance Handbook and AGC's "We Can Work It Out Program."   However, Plaintiff testified that she never received a copy of the Co-Worker Alliance Handbook and AGC's "We Can Work It Out Program" and signed the form without reading it because she was in a hurry to get back to work.  I fully credit Plaintiff's testimony and find that Plaintiff was not given a copy of the Co-Worker Alliance Handbook or the rules and procedures governing arbitration.

26.     Plaintiff argues that the alleged agreement is illusory because it allows AGC to unilaterally change the terms.  Agreements to arbitrate have been held invalid where they allow the employer to unilaterally change the rules.  *See Hooters of America v. Phillips*, 173 F. 3d 933, 939 (4th Cir. 1999).  The Co-Worker Alliance Handbook states at one point that "I understand that this handbook superseded any and all prior handbooks and that *except for employment at-will and the agreement to arbitrate* as provided for in this handbook, AGC reserves the right to at any time change, delete, modify, or add to any of the provisions contained in this handbook at its sole discretion, by giving written notice to us."  (Pl. Ex. 1 at p. 5) (emphasis added).  However, at the back of the Co-Worker Alliance Handbook is an "Acknowledgment" stating that "I further

understand that the Company reserves the right to amend, supplement, rescind or revise any policy, practice, or benefit described in this handbook – *other than employment at-will provisions* – as it deems appropriate." (Pl. Ex. 1 at 13) (emphasis added). Notably, the agreement to arbitrate is omitted. AGC's Handbook contains inconsistent provisions as to whether it retained the right to unilaterally alter the agreement.

27.     The inconsistent provisions are ambiguous because they are reasonably and fairly susceptible to different constructions. *Monette v. Tinsley*, 126 N.M. 748, 751, 975 P.2d 361, 364 (Ct. App. 1999) (*citing Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993)). Absent the presentation of other evidence, the trial court resolves ambiguity by interpreting the contract using accepted canons of construction and traditional rules of grammar and punctuation. *Monette*, 126 N.M. at 751, 975 P.2d at 364. No evidence has been presented pertaining to the meaning of the arbitration provisions, other than writing itself. The contract in this case should be construed against AGC because AGC drafted the agreement. *See Western Farm Bureau v. Carter*, 127 N.M. 186, 187, 979 P.2d 231, 232 (1999). So construed, the agreement binds Plaintiff to arbitration, but allows AGC free rein to renege. This lopsided arrangement is illusory because it allows AGC to unilaterally modify the terms at any time.

28.     Plaintiff additionally contends that the arbitration agreement is unenforceable because it does not apply equally to both Plaintiff and AGC. The agreement lists causes of action that an employee would usually bring against an employer and utilizes the first person. There is no signature line for AGC in the agreement. Courts have invalidated arbitration agreements that exempt the employer from coverage. *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F. 3d 1126 (7th Cir. 1997); *Zamprelli v. AGC*, CIV 00-0181 BB/RLP (D. N.M. Aug. 28 2001) (observing that an

13

identical agreement was unenforceable because it suffered the same infirmity as that in *Gibson*).  The alleged arbitration agreement is not mutual because it does not apply equally to both parties.  As in *Gibson*, the alleged agreement is unenforceable because it does not apply equally to both Plaintiff and AGC.

29.     Plaintiff further asserts that the alleged agreement is unenforceable for lack of consideration because it was executed over two-and-a-half months after she started working for AGC.  An arbitration agreement is unenforceable if it is unsupported by consideration. *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F. 3d 1126 (7th Cir. 1997)).  If the employee signed an arbitration agreement after she was hired, and was not given anything in return for signing away her rights, the agreement is unsupported by consideration. *Zamprelli v. American Golf Corp.*, CIV 00-0181 BB/RLP (Aug. 28, 2000).  I recognize that economic considerations may require modification of an at-will employee's working conditions, such as scheduling and compensation.  However, the rights that Plaintiff purportedly surrendered were far more important than those associated with mere conditions of employment.

30.     As a matter of public policy, I hold that where the contract is ambiguous on its face, is illusory and not mutual, the right of access to an Article III forum to resolve disputes is a fundamental right that may not be relinquished without consideration.   In the case of an arbitration agreement unsupported by consideration, issues surrounding the method of dispute resolution must be clear, unequivocal and apply mutually to both sides before that agreement may be enforced.  The alleged arbitration agreement in this case was ambiguous, illusory, not mutual, and unsupported by consideration.  For these reasons, the alleged arbitration agreement is unenforceable.  Plaintiff should not be compelled to arbitrate her claims brought herein.

14

**RECOMMENDED DISPOSITION**

I recommend that Defendants' Motion to Compel Arbitration and Request for Immediate Stay (Doc. 8), filed May 18, 2000, be **DENIED**.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court written objections to such proposed findings and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.


_____

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**

15